## GEORGE G. BRADLEY

*v.*

## THE GLENMARY COMPANY.

[Submitted July 10th, 1902. Decided September 25th, 1902.
Filed January 26th, 1903.]

1. On mortgage foreclosure, evidence considered, and *held* to show that an agreement was in fact made for the extension of the time for the payment of the mortgage.

2. The reduction by a mortgagor of the amount due on a first mortgage is a sufficient consideration to support an agreement by the second mortgagee extending the time for payment of his mortgage.

3. When a mortgagor, on negotiations between him and the first and second mortgagees, pays a sum on the first mortgage, the mortgagor believing that there is an understanding that in consideration of such payment the time for payment of the second mortgage is to be extended, though no such agreement was made by the second mortgagee, there is a *quasi* estoppel against his foreclosing before the time to which the mortgagor believed payment extended.

4. In suit to foreclose a mortgage, a failure to pay taxes after the filing of the bill is of no avail to complainant.

On final hearing on bill, answer and proofs.

This is a bill to foreclose a mortgage dated November 23d, 1899, made by the defendant to the complainant, to secure the sum of $2,000 in one year, with interest payable semi-annually. The interest clause, which is in typewriting, is this: "To be paid upon the twenty-third days of November and May of each year." Then follows, in the printed part, the usual clause that if interest shall remain in arrear for thirty days the principal may be declared due.

The bill was filed on October 19th, 1901, nearly eleven months after the maturity of the bond.

The defence set up is that by an arrangement made between complainant and defendant, based upon a valuable consideration,

the time of the payment of the principal was extended for a period of three years from March 26th, 1901.

*Mr. Lindley M. Garrison,* for the complainant.

*Mr. Cornelius Doremus,* for the defendant.

PITNEY, V. C.

The bond and mortgage in question were given by the defendant to the complainant as part consideration of a conveyance by the complainant to the defendant of the mortgaged premises on the day of the date of the mortgage.

The property was sold subject to a mortgage made by a former owner to secure the sum of $9,000, referred to in the evidence and known as the Ryerson mortgage.

The defendant is a corporation engaged in maintaining one or more sanitariums or health resorts. Its domicile is at Owego, in the State of New York, where, at one time, it seems to have owned considerable property.

As part of the consideration of the conveyance the complainant, or his father, Mr. Edward A. Bradley, received a large block of stock in the defendant corporation. The amount of cash paid was insignificant.

In October, 1900, a bill was filed to foreclose the first mortgage, to which the complainant herein was made a party as second mortgagee, and such proceedings were had thereon that a decree was made in favor of complainant therein, and the property was advertised for sale for a day in January, 1901.

The defendant employed a Mr. Chatfield, a lawyer of Flatbush, New York, to delay the sale, and he obtained adjournments by making three successive payments of $250 each to Major Ryerson, the solicitor of the complainant therein, and finally entered into negotiations on behalf of the defendant for a permanent settlement of the Ryerson mortgage. The result was that Major Ryerson proposed that if the defendant would reduce the amount due on his mortgage to $7,000 he would give an extension of three years.

Bradley *v.* Glenmary Co.

The counsel for the defendant at Owego was a law firm of Clark & Trueman, of whom Mr. Trueman had charge of defendant's business. He came to New York to see the complainant, who is a practicing lawyer there, and arrange for an extension of both mortgages. I am entirely satisfied that at that time Mr. Trueman supposed that the complainant herein had a decree for the amount of his mortgage embodied in the decree under which the property was advertised. Such was not the fact. An inspection of the papers in the Ryerson foreclosure shows that the Bradley mortgage was handed to Major Ryerson, and by him presented, with his own, to the master, and by him reported upon with the Ryerson mortgage; that Major Ryerson prepared a decree directing execution to issue to raise the amount due on each mortgage. The part of the decree which related to the Bradley mortgage was stricken out in the clerk's office, and the execution, presumably, was worded accordingly. It has never been returned. The reason for this action by the clerk, presumably, was that no answer had been filed by Bradley and no order of reference made.

In order to raise the money to reduce the first mortgage it was necessary to get the consent of all the stockholders in the defendant corporation to execute a mortgage on the property in Owego. Among those stockholders was Mr. E. A. Bradley, the father of the complainant, to whom, as we have seen, the stock part of the consideration for the conveyance of the premises here in question was issued, and who it now appears is interested financially in the mortgage here under foreclosure. The result of the negotiations was that the money was raised and paid to Major Ryerson, and he and the complainants in the foreclosure signed this receipt:

"Received in several payments on account of the above decree, interest, taxed costs and sheriff's fees the sum of $2,460.59, in consideration of which payment we, the undersigned, the complainants above named, do hereby agree not to further prosecute or enforce said decree for three years from the date hereof, provided interest at the rate of five per cent. per annum shall be promptly paid to us on the sum of $7,000, the amount remaining unpaid on said decree, semi-annually, on the 26th day of September and March in each year from the date hereof, or within thirty days after during said period; provided, also, that all taxes and assess-

Bradley *v.* Glenmary Co.

ments now or that may hereafter during said period become a lien on the lands described in the mortgage upon which said decree is founded, shall be duly paid when due and payable. Dated March 26th, A. D. 1901."

Added to that is another receipt in the handwriting of Major Ryerson, signed by the complainant herein, in these words:

"I hereby consent to the discontinuance of proceedings to enforce the final decree in the above-stated action, and consent to a return of the execution issued in said cause to the clerk of said court, and to the agreement above set forth. Dated March 26th, 1901."

Mr. Trueman swears positively that before the payment was made he applied to the complainant herein at his office for an extension of his mortgage; and the fact that the payment of $2,000 on the principal, and all arrears of interest and costs, on the Ryerson mortgage would increase the standing and value of the complainant's mortgage, was relied upon as a reason for such extension. And it further appears by the evidence of Mr. Chatfield that as none of them was a New Jersey lawyer it was discussed between Trueman, complainant and himself, in complainant's office, whether, if the extension was signed only by the complainants in the Ryerson foreclosure, he, the complainant herein, would have a right to open and vacate the extension so far as he was concerned, and enforce his mortgage. Mr. Trueman further swears positively and distinctly that Mr. Bradley, the complainant herein, agreed orally, to extend his mortgage for the same term as the Ryerson mortgage, and that it was supposed by them and Mr. Chatfield, who was present at some of the interviews, that the signing of the agreement which complainant did actually sign would have the effect of extending his mortgage.

Further, Mr. Chatfield swears that he had several interviews and conversations with the complainant herein on the subject, and that the benefit to complainant herein of the reduction of the Ryerson mortgage was naturally a matter of conversation; and the complainant herein desired to have that reduction accomplished; and he says that at the next to the last of those interviews the complainant herein said that before signing any paper or giving any express agreement on the subject he wished

to consult his father; and, finally, on the day when the contract of extension was signed, he said that his father was unwilling that he, the complainant, should give an express written extension other than that actually signed, but that the mortgage should stand if the interest and taxes were paid.

The clear effect of the evidence of Mr. Trueman and Mr. Chatfield is that complainant did in effect agree verbally, in addition to signing the writing above recited, that if the first mortgage was reduced to $7,000 and the interest and taxes were paid, the second mortgage might remain until the end of the three years' extension given by the Ryersons.

On the other hand, the complainant denies this and says that he had no interest in the mortgage; that he held it as trustee for his father, and that he spoke to his father on the subject and that he declined to grant any extension for any definite length of time, but authorized him to say, and that he did say, to the gentlemen just named, that it might remain until they had time to turn themselves and make arrangements to raise the money and pay it.

But the account given by the two witnesses, Chatfield and Trueman, for the defendant is corroborated by that of Mr. Clark, of the firm of Clark· & Trueman, who came to see the complainant a few months later, after the latter's father had written peremptorily to the defendant that his mortgage must be paid unless the defendant would furnish a purchaser, at a satisfactory price, for the block of stock which he held in the defendant company. He swears that in the interview which he had at that time with the complainant the latter said that he understood that the bargain between him and the representatives of the defendant, at the time the extension of the Ryerson mortgage was effected, was that his mortgage should be extended for the same length of time and upon the same terms, but that his father did not so understand or was unwilling to stand by that agreement. Mr. Chatfield swears to a similar admission made at about the same time.

After a very careful examination and comparison of the evidence of these witnesses, I come to the conclusion that the weight of the evidence and the probabilities of the case are in favor of

the defendant's contention. Of one thing I am well satisfied, that, whatever may have been in the minds of the Bradleys, father and son, however careful and restricted they may have been in the language used by the complainant herein to the representatives of the defendant at and about the time of the granting of the extension of the Ryerson mortgage, the complainant knew that the defendant's attorneys did understand, and complainant was willing that they should understand, that his mortgage should stand as long as the first mortgage stood.

It is manifest that the property was a slender security for both mortgages at their full face. It is stated that only $500 in cash were paid; and the proof shows that the complainant's father expected to be compelled to buy the property at the sale under the Ryerson decree for not more than the amount of the Ryerson mortgage; and it is clear that it was decidedly to the benefit of the complainant or his father, whichever was the real owner of the mortgage, to have the first mortgage reduced, and it is entirely clear that they held out every inducement to the defendant to effect that reduction; and among those inducements was the holding out to them the expectation that they would have no trouble with the second mortgage if they obtained the first to be reduced. And it is manifest that the defendant would not feel much encouraged to go to all the trouble and expense that it did to raise the money to reduce the first mortgage if its officers had supposed that it would immediately be called upon to pay the second mortgage.

Yet it appears that as early as the 19th of June, 1901, less than three months after the settlement of the Ryerson mortgage, and when no payment of interest was overdue and no arrears had accumulated, the elder Bradley, in writing, called upon the Glenmary Company to pay his mortgage, and then, when remonstrated with, said he would extend it if the defendant would furnish a purchaser, at a satisfactory price, for his stock in the defendant corporation.

Some doubt is attempted to be thrown upon the evidence of Mr. Trueman by a letter which was written by him to Mr. Bradley on July 6th, 1901, in which he uses this language:

"Now from the conversation I had with you when I was in New York looking after the Ryerson mortgage I understood that you would be willing to allow your mortgage on the property to remain if the interest were promptly paid thereon. Of course there was no agreement, but I am sure that the understanding was that the mortgage would be allowed to stand."

Confronted with the language "of course there was no agreement," the witness explained on the stand that he meant no formal written agreement. At the time of writing that letter the witness had not conferred with Mr. Chatfield, whose evidence shows that he had more to do in procuring the alleged extension than had Mr. Trueman. It is manifest, and he so swears, that by the word "agreement" used in that letter he meant a formal contract in writing between the complainant and the defendant, because he was present when the consent was signed by the complainant to the Ryerson extension; and he was also a party to the discussion as to how far that agreement bound the Bradleys.

The case presents no difficulty on the score of consideration for the alleged contract. As already observed, the reduction of the amount due on the first mortgage by the payment on the principal of $2,000, with all arrears of interest, thereby reducing it to $7,000, was a direct benefit to the complainant.

Nor do I find any difficulty on the score of a contemporaneous parol contract varying the terms of a written contract. If the written consent to the Ryerson extension operated as an extension of the second mortgage held by complainant, then, of course, the oral agreement does not alter or vary it. If, however, that written document had no effect upon that mortgage, then, again, the oral agreement does not vary it in any respect. The fact is that the parties, though lawyers, were uncertain in their minds as to what would be the effect of the contract actually signed. They were not advised of its effect, and hence the anxiety on their part to have a direct contract between the complainant herein and the defendant providing directly for the extension of the time on his mortgage; and that contract, I think, by the clear weight of the evidence, was either actually made by complainant, or believed by the attorneys of the defendant, on just grounds, to have been made, and that the payment to Ryerson of two thousand and odd dollars was made on the strength of

it. If this be so, then a *quasi* estoppel arises against the complainant. In other words, it is highly inequitable and unjust for him to prosecute his foreclosure before the expiration of the time mentioned.

It was further suggested that the taxes were not paid promptly. Proof was offered that the taxes were actually paid in accordance with the terms of the Ryerson extension, but not promptly. The case, however, must be taken as it was at the time the bill was filed, and then, as I understand the evidence, the taxes had been paid, and, after bill filed, the interest due on the 23d of November was tendered and refused.

I will advise a decree that the bill be dismissed, with costs.

